**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DW DATA, INC.,** | ) | |
| **a Delaware Corporation,** | ) | |
| **d/b/a Digital Work,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 C 01666** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **C. COAKLEY RELOCATION** | ) | |
| **SYSTEMS, INC.,** | ) | |
| **a Wisconsin Corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

### INTRODUCTION

DW Data, Inc. ("DW Data") is a Delaware Corporation that hosts and constructs small business websites, provides search engine submission service through a partnership with Earth Link and entertainment event ticketing services for performing arts venues on the web, and offers a free website community called Zoomshare, a social network. Its annual revenues have been between $600,000 and $1 million. (*Ex. 1, Morganstern Dep.* at 10-11). C.Coakley Relocation Systems, Inc. ("Coakley"), a Wisconsin corporation, is a full service moving and storage business.

DW Data claims that Coakley lost two Sun Microsystem computer servers loaded with Oracle 8i software that were stored with Coakley pursuant to a bailment agreement, causing damages of $224,726.00. While disputing liability – Coakley claims never to have had the servers in its possession – Coakley contends that if it is liable, the damages do not exceed

$38,000, which, it insists, is the "replacement cost" for the missing servers, software, and installation. (*See Ex. 2 Expert Report of Lisa Wright* at 3; *Ex. 4, Expert Report of Lisa Wright LLC*, "Determining the Replacement Cost of an Oracle System" at 5).[1]

The plaintiff agrees that the fair market value of the lost servers is less than $10,000. The problem is with the Oracle Database software, version 8i ("Oracle 8i"), including an Enterprise Edition license, which DW Data purchased from Oracle in 2000 for a million dollars. Since it is undisputed that Oracle no longer sells or supports the 8i software, the plaintiff contends there is no legitimate market for the software, and that purchase of the Oracle software that replaced the 8i version is the only way it can be placed in a position comparable to that it enjoyed before Coakley lost the servers and software. That will cost about $220,000 for the software and accompanying license.

It is the defendant's contention that the plaintiff's license for the Oracle 8i software it purchased in 2000 for $1 million is perpetual and allows it to use any 8i software even if purchased from a private source not affiliated in any way with Oracle. The defendant insists such software is available in the market from private sources and has a fair market value of $90 – the price the defendant's expert, Lisa Wright, paid an acquaintance for 8i software disks he happened to have.

The parties have tacitly assumed Illinois law governs and therefore will be deemed to have stipulated to its application. *National Ass'n of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.*, 779 F.2d 1281, 1285 (7th Cir. 1985).

---

[1] There are three different reports by Ms. Wright. *See Vol2.*, Ex. 2, 3, 4. Exhibit 4, in Volume 2's Table of Contents, is titled "Wright Revised (FINAL) Report" and is the version cited to throughout this Opinion. Neither party noted any important discrepancies or inconsistencies between the reports.

# I.
## PROCEDURAL HISTORY

On May 21, 2010, the parties exercised joint consent to jurisdiction here. [Dkt. #17]. On May 7, 2012, following the close of discovery and unsuccessful attempts to settle the case, Coakley withdrew its jury demand. [Dkt. #43]. The parties' attorneys informed me that in an effort to rein in litigation costs, they would not be calling their respective expert witnesses at trial. Rather, they would rely on the experts' reports and their depositions. Additionally, they would rely exclusively on the depositions of a number of other witnesses, as well as introducing the depositions of the few witnesses the parties planned to call at trial.[2] Two witnesses were called at trial: Michael Morganstern, the current CEO of DW Data, and Christopher Coakley, the President of C. Coakley Relocation Systems. The second day of trial consisted of closing arguments and discussions regarding the evidence and counsels' respective positions. The parties thereafter submitted Proposed Findings of Fact and Conclusions of Law. [Dkt. ## 49, 59

# II.
## OVERVIEW OF THE EVIDENCE [3]

It is undisputed that on about January 31, 2000, DW Data purchased one Sun Microsystems E6501 server and one Sun Microsystems E4500 server from PDC Solutions, Inc., a computer technology dealer. The actual price of the servers plus hardware upgrades was

---

[2] At trial, the parties presented three large three-ring binders. The first, referred to as "Blue Tab," contains eight non-expert deposition transcripts totaling over three hundred pages, including the depositions of the witnesses called at trial. The second and third binders, referred to as "Orange Tab," consist of two volumes, each in its own binder. "Volume 1" has thirty-seven exhibits. "Volume 2" consists of twelve exhibits including the parties' expert witnesses' deposition transcripts and reports, as well as documents presumably relied on by the experts. This, along, with the trial testimony, constitutes the evidentiary record in the case.

[3] The various sections of this Opinion constitute the Findings of Fact and Conclusions of Law required by Rule 52(a)(1), Federal Rules of Civil Procedure.

$562,082.38. (*Vol. 1*, Ex. 1, 2). Additionally, DW Data purchased 36 months of maintenance for each server for a total cost of $122,356.59. *Id.* The servers were sent directly to Exodus Communications, an internet hosting service. *Id.* The Sun 6500 server was the size of a small or medium refrigerator. (*See, e.g., Ward Dep.* at 10-11; *Reinke* Dep. at 23; *Vol. 1*, Ex. 9, at 3).

In addition, about a month later, on March 9, 2000, DW Data purchased Oracle Database software, version 8i ("Oracle 8i"), including an Enterprise Edition license, for $1,049,538.35. (*Vol. 1*, Ex. 3). The software was considered to be the best commercial database on the market. The software license gave DW Data the right to run the Oracle 8i software indefinitely. (*Vol. 1*, Ex. 21, 22). The license was not assignable, and the software could not be given to a third party without Oracle's permission. More on this later. *See infra* at 37. Part of the purchase included one year of Oracle support, which gave the purchaser the ability to upgrade to new releases of Oracle software and to access Oracle's technical support services via the phone and web. (*Morganstern Dep.* at 63-64; *Vol. 2, Ex. 4*, "*Wright Report*" at 2-3).

In order to extend Oracle support, annual service and support fees had to be paid, which typically would amount to 22% of the original software purchase price. (*Id.; Morganstern Dep.* at 63-64). Because of financial difficulties, DW Data chose to allow its annual support renewal to lapse, thereby eliminating the ability to upgrade its software to a newer version, download patches or bug fixes, or obtain the software via download or physical media. (*Wright Report* at 2-3).

DW Data had purchased the Sun servers and Oracle software in anticipation of an initial public offering. (*Morganstern Dep.* at 16-17). DW Data was unable to raise the capital required to take the company public, and when the dot.com bubble burst, it effectively ended DW Data's

4

attempt to go public. (*Morganstern Dep.* at 21-22). On December 19, 2002, as part of downsizing, DW Data moved its office. (*Morganstern Dep.* at 27-29) and contracted with OFIS, Inc. / National Van Lines ("OFIS") to perform the move and rented approximately 200 square feet of commercial storage space at OFIS's facility in Gurnee, Illinois. Various items, including the two Sun servers and two Canon copiers went into storage. (*Id.; Vol. 1,* Ex. 4, 5, 7, 8, H, J). Plaintiff's Exhibit J is a detailed OFIS inventory of the property placed in storage and lists, *inter alia,* the Sun 6500 and Sun 4500 servers, and two copiers. DW Data kept its account with OFIS in good standing by paying the monthly storage fees, and the servers remained in the possession of OFIS until about March 22, 2007. (*Vol. 1,* Ex. 20; *Mesterhazy Dep.* at 22).

On March 22, 2007, Coakley and OFIS entered into an Asset Purchase Agreement ("APA"). (*Vol. 1,* Ex. A; *Coakley Dep.* at 8). The APA refers to an "Exhibit A" which, Mr. Coakley described as "a summary list of what was being purchased." (*Coakley Dep.* at 10; *see also Vol. 1,* Ex. A, at 1). "Exhibit A" was described in the Asset Purchase Agreement as a "table of contents" of what was being purchased.

Coakley admits it purchased the majority of OFIS's storage lots, including the lot belonging to DW Data (*Coakley Dep.* at 12; *Vol. 1,* Ex. B), and that it "received enclosed containers from [OFIS] with inventories created by [OFIS, i.e., Ex. J]." (*Vol. 1,* Ex. E, "*Defendant's Answers to Interrogatories,*" ¶7). Although Exhibit A was requested in discovery, it was never produced. (*Coakley Dep.* at 15; *Mesterhazy Dep.* at 5-6). Mr. Coakley claimed that it was never prepared and must have "fallen between the cracks." *See infra* at 21.

Over the course of a week or two in multiple deliveries, the storage lots were transferred by Coakley from OFIS to Coakley's facility in Milwaukee, Wisconsin. Tim Reinke, Coakley's

project manager, oversaw the move. (*Coakley Dep.* at 14). Mr. Reinke said he created a hand-drawn post-delivery floor plan documenting nothing more than the physical location of customers' items in Coakley's facility. (*Vol 1,* Ex B; *Reinke Dep.* at 18-19).[4] Open storage or "loose" items – that is to say items not contained within a storage crate, or "speed pak" – were not individually documented on this diagram. (*Mesterhazy Dep.* at 7-14).[5] Thus, the servers could well have been received from OFIS without being shown on the diagram. And Reinke claimed no crates of corporate customers were opened and inventoried (*Reinke Dep.* at 14-16), despite Coakley's general practice of "creat[ing] an inventory at the time of loading and cross-check[ing] the inventory upon placement in its storage facility." (*Vol. 1,* Ex. E, *"Defendant's Answers to Interrogatories,"* at ¶7). Mr. Coakley claimed that he just "assumed" that his company got all that it purchased and thus accepted the contents of OFIS's storage lots without verifying what was actually being received. *See discussion* at 16, 21.

In early 2008, the new CEO of DW Data, Michael Morganstern, learned of the storage arrangement with Coakley. (*Morganstern Dep.* at 29). He sent an employee, Kelley Fogg, to Coakley to determine what was in storage. (*Morganstern Dep.* at 29-30). Ms. Fogg reported that the items in storage were large and would be difficult to move. (*Morganstern Dep.* at 34). Shortly thereafter, DW Data contacted Rhonda Mesterhazy, Coakley's Vice President of Operations, who was involved in coordinating the move of the OFIS storage lots to the facility in

---

[4] These wooden crates, sometimes referred to as pallets or vaults, are approximately 7 feet tall, 7 feet wide, and 8 feet deep. (*Reinke Dep.* at 24). Given these dimensions, either or both servers could have been stored inside such a crate.

[5] A "speed pak" is a large moving carton approximately 3 feet tall, 3 feet wide, and 4 feet long. (*Coakley* Dep. 13).

Milwaukee. On January 11, 2008, in an e-mail exchange between Ms. Mesterhazy and Ms. Fogg, Ms. Mesterhazy said she had a two-page inventory of DW Data's property, but that she was "not 100% certain that all the goods [were] *still* in [Coakley's] storage facility." (*Vol 1,* Ex. 6, at 6) (Emphasis supplied).[6] The basis for this statement was not explained, and Coakley did nothing to determine whether anything was actually missing. Of course, this sort of hedging never found its way into Mr. Coakley's letter of April 19, 2007 to DW Data, which assured DW Data that it had everything.

Ms. Mesterhazy faxed the two-page itemized inventory listing the Sun servers to DW Data. (*Vol. 1,* Ex. 7; *see also, Morganstern Dep.* at 36-38).[7] At that time, Mr. Morganstern made the decision to leave the servers and other items temporarily in storage at Coakley. (*Morganstern Dep.* at 43). In late 2009, Mr. Morganstern learned that the Sun servers and the Oracle software could be utilized in DW Data's current internet business and requested that Coakley deliver the servers. (*Morganstern Dep.* at 44-45, 70, 89).

On November 13, 2009, Coakley was scheduled to deliver the servers and the other items in storage to DW Data. (*Morganstern Dep.* at 49). Rico Munoz, a driver for Coakley, testified that an inventory is conducted for most deliveries to and from Coakley's storage facility. (*Munoz Dep.* at 6-7, 12-13, 44-45, 49). Mr. Coakley had denied that this practice was followed in 2007 in connection with the OFIS purchase. In any event, when loading the truck for delivery, Mr. Munoz was unable to locate several items, including the servers and the two Cannon copiers,

---

[6] The obvious implication was that at one time Coakley had the items, but could not say that it presently had them.

[7] Exhibit 7 is a faxed copy of the original inventory sheet that was generated by OFIS at the time it moved DW Data's property to its storage facility in Gurnee, Illinois, in December 2002. The original is Ex. J.

which were listed on his delivery sheet. (*Mesterhazy Dep.* at 34; Vol. 1, Ex. H, at 2). The plaintiff is not seeking compensation for the copiers.

After being notified that the items were missing, Ms. Mesterhazy instructed Munoz to put down that the items were never received from OFIS. (*Mesterhazy Dep.* at 34-35; *see Vol. 1,* Ex. H). When Mr. Morganstern realized that the servers were not included as part of the delivery, he called Coakley. (*Morganstern Dep.* at 49). He was told by Ms. Mesterhazy that he would need to fill out a claim for the missing servers. (*Mesterhazy Dep.* at 36-37, 49). After filing the claim with Coakley, Mesterhazy forwarded the claim form to Joanie Kowalski, a customer service representative for Coakley. (*Kowalski Dep.* at 4, 7). Realizing the amount of the claim based on an initial valuation of the missing servers was significant, Ms. Kowalski notified Mr. Coakley. (*Kowalski Dep.* at 18). Two searches by Coakley employees failed to locate the servers. (*Mesterhazy Dep.* at 38).

Ms. Kowalski testified at her deposition that for each customer, there is usually an itemized inventory of what is contained in each storage crate or box. (*Kowalski* Dep. at 9-12). If a customer comes to the facility and removes an item from storage, it is noted on the inventory list and signed for by that customer. (*Id.* at 12; *see also Isnard Dep.* at 13). OFIS's records for DW Data, which were provided to Coakley, do not indicate that any of DW Data's items were ever removed, nor do Coakley's records.

### III.
### ANALYSIS OF THE PLAINTIFF'S CLAIMS AND
### THE EVIDENCE IN SUPPORT OF THOSE CLAIMS

DW Data's complaint contains six claims for relief: 1) Breach of Contract; 2) Promissory Estoppel; 3) Equitable Estoppel; 4) Bailment; 5) Conversion; and, 6) violation of the Consumer

Fraud and Deceptive Business Practices Act. [Dkt. #1]. Evidence relating to the specific claims is discussed below.

## A.
### The Illinois Consumer Fraud and Deceptive Business Practices Act Claim

The plaintiff contends that the defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act"), 815 ILCS. 505/1 *et seq*., by, *inter alia*, concealing that it did not have the servers. In order to plead a cause of action under the Act, a plaintiff must show: 1) a deceptive act or practice by the defendant; 2) the defendant's attempt that the plaintiff rely on the deception; 3) the occurrence of the deception in course of conduct involving trade or commerce; and 4) actual damage to the plaintiff proximately caused by the deception. *Sound of Music Co. v. Minnesota Min. & Mfg. Co.*, 477 F.3d 910, 923 (7th Cir. 2007); *Oliveira v. Amoco Oil Co.,* 201 Ill.2d 134, 149 (2002); *Dubey v. Public Storage, Inc*., 395 Ill.App.3d 342, 353, 918 N.E.2d 265, 277 (1st Dist. 2009).

A breach of a contractual promise, without more, is not actionable under the Act. *See Avery v. State Farm Mut. Auto. Insurance. Co.,* 216 Ill.2d 100, 835 N.E.2d 801, 844 (2005). Thus, when "breach of contract and Consumer Fraud Act counts rely on the same facts," it is clear that the consumer-fraud claim "is merely a breach of contract count clothed as a violation of the Consumer Fraud Act." *Sklodowski v. Countrywide Home Loans, Inc.,* 358 Ill.App.3d 696, 832 N.E.2d 189, 196 (1st Dist. 2005). The Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy. *Avery*, 216 Ill.2d at 169, 835 N.E.2d at 844. Thus, courts must take care not to allow suits for breach of contract to be converted through artful pleading into a consumer fraud action. *Western Howard Corp. v. Indian Harbor Insurance. Co.,* 2011 WL 2582353, 4 (N.D.Ill. 2011).

The plaintiff's position is that it was deceived by the defendant in 2007, when Coakley forwarded to it an inventory listing the two Sun servers, leading the plaintiff mistakenly to believe that Coakley had the servers at its facility. The plaintiff insists that defendant committed similar acts of "deception" in November 2009 after the computers were known to have been lost. But there was no proof that when the alleged misrepresentations were made prior to 2009, Coakley knew it did not have the servers and sought to deceive the plaintiff into believing that it did. And the proof was clear that neither the pre nor post 2009 misrepresentations caused the plaintiff harm.

A private cause of action under the Act requires proof of actual damage to the plaintiff *caused by the deception*. 815 ILCS 505/10a(a); *Oliveira* 201 Ill. 2d at 149. Neither in the extended colloquy following the presentation of evidence at trial nor in the post-trial submissions has DW Data been able to articulate what damage it suffered as a result of defendant's claimed deception (*i.e.*, Coakley either telling DW Data it had its servers when it didn't or telling them it wasn't sure if it had the servers when it knew it didn't). Thus, the Act's proximate causation requirement has not been met. *See also, Clark v. Experian Info. Solutions, Inc.,* 256 Fed.Appx, 818, 821 (7th Cir. 2007).

If DW Data had known the "truth" in January 2008, or October 2009, what would it have done differently and how would that have avoided the loss claimed in this case? At trial, the plaintiff could not show that its reliance on the claimed misrepresentations caused the loss of the computers and software or that had it known about them it could have avoided the loss. During and after the trial, I pressed plaintiff's counsel repeatedly to explain how even if the plaintiff had known the "truth" at the time of any misrepresentation it could have avoided the harm – which

10

occurred before the misrepresentation – and which it would appear prompted the misrepresentations. Not surprisingly, plaintiff's counsel could not do so.

The plaintiff's post-trial presentation fares no better.  In its Supplemental Proposed Findings of Fact and Conclusions of Law, the plaintiff argues that but for the defendant's "pattern of unfair and deceptive acts and practices, it would not have incurred $4,892.11" in storage charges.  *Id*. at ¶71. But those are damages that come only in the wake of a proven Consumer Fraud Act violation. The plaintiff ratified the defendant's assumption of the OFIS contracts by continuing for two years to pay the amount charged by Coakley following the 2007 sale, and there is no proof of when the computers disappeared from Coakley's facility so that it cannot be ascertained when the first misrepresentation was made prior to the delivery of the stored items to DW Data in 2009. *Compare Sharon Leasing, Inc. v. Phil Terese Transp., Ltd.,* 299 Ill.App.3d 348, 358, 701 N.E.2d 1150, 1157-1158 (2nd Dist. 1998)("Absent any evidence concerning the number of trucks resold or leased, the proceeds from the resale or lease of those trucks, or the net fair market value of the retained vehicles, the trial court could not ascertain the damages that would place plaintiff in the position it would have been in had the contract been performed. Plaintiff's claim... was at best speculative").

Finally, plaintiff would have incurred charges to store the items in any event, and even if damages were otherwise appropriate, they would only be the difference between the amount paid to Coakley after the first misrepresentation  – the date of which was not proven – and the amount that would have been paid to a successor bailee.  The plaintiff has offered no proof regarding the rate a different storage company would have charged, and for all one knows, the storage charges of another warehouse could have been greater than that charged by Coakley. Hence, there is

nothing to sustain the claim for $4,892.11.

The plaintiff also seeks to justify the claim for $4,892.11 in monthly storage fees on the basis of new, undeveloped allegations that the defendant "wrongfully took possession of the plaintiff's stored items," and that plaintiff is entitled to an indeterminate amount of money for "the time and resources of Mike Morganstern, plaintiff's principal." Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law at 12, ¶79 [Dkt. #49]. No proof was ever offered to support this claim, including the amount of time spent by Morganstern or the value of his time, and it was not in the complaint. In any event, given the plaintiff's ratification of the defendant's assumption of possession of its property by paying storage charges for a two-year period, the manner in which Coakley came into possession of the defendant's property in 2007 cannot support any claim for damages.

The plaintiff has failed to prove, as the Act requires, the requisite proximate causation between the claimed misrepresentations and the claimed damages. Judgment shall be for the defendant on this claim.

## B.

### The Promissory and Equitable Estoppel, Bailment, Breach of Contract and Conversion Claims

The Promissory and Equitable Estoppel claims assert that the plaintiff relied on representations from the defendant that Coakley was storing their property, including the servers, and that the plaintiff's reliance on these representations resulted in damages to DW Data. As with the Consumer Fraud Act claim, the plaintiff cannot show that it relied to its detriment on the alleged misrepresentations or that they resulted in the loss of the servers and software, which is the damage it claims. Presumably, the plaintiff has decided to abandon these theories of

12

liability, as it failed to mention either, even in passing, in its proposed findings of fact and conclusion of law. [Dkt. #49]. On these claims, judgment shall be for the defendant.

The remaining claims – Bailment, Breach of Contract, and Conversion – while independent theories of liability, can be conveniently addressed together. Indeed, the parties, at various times, throughout the trial and their respective briefs, often fail to distinguish between these claims. For example, while the defendant in its trial brief specifically addressed the consumer fraud claim and conversion claims, (*see* Dkt. #58), it did not address the breach of contract or bailment claims by name. In its view, the basis of any particular claim is inconsequential since it cannot be liable under any theory because it never had possession of the servers. (*See*, *e.g.*, Dkt. #57). As discussed below, I reject that contention.

At bottom, this case involves a bailment. A bailment is the delivery of property for some purpose upon a contract, express or implied, that after the purpose has been fulfilled, the property shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept until he reclaims it. In order to properly plead the existence of and the right to recover under a bailment theory, the plaintiff must prove an agreement, express or implied, to create a bailment; delivery of the property in good condition; acceptance of the property bailed by the bailee; and nonreturn or redelivery of the property in a damaged condition. *American Ambassador Cas. Co. v. City of Chicago,* 205 Ill.App.3d 879, 881-82, 563 N.E.2d 882, 884 (1st Dist. 1990). Bailment may sound either in tort or contract, at the plaintiff's option. *Cf., Byrton Dairy Products, Inc. v. Harborside Refrigerated Svcs., Inc.*, 991 F.Supp. 977, 985 (N.D.Ill. 1997); *Biddle v. Salem School Dist. No. 600*, 249 Ill.App.3d 768, 770, 619 N.E.2d 530, 531 (5th

Dist. 1993); *American Ambassador Cas. Co.*, 205 Ill.App.3d at 881-82, 563 N.E.2d at 884 (1st Dist. 1990).[8]

To prove breach of contract under Illinois law, a plaintiff must show (1) the existence of a contract; (2) its performance under the contract; (3) the defendant's breach; and (4) injury resulting from the breach. As the party seeking to recover, the plaintiff must establish the correct measure of damages. *Harmon v. Gordon,* 712 F.3d 1044 (7th Cir. 2013); *Burwell v. City of Madiun,* 378 F.3d 642, 651 (7th Cir. 2004).

Under Illinois law, to recover for conversion, a plaintiff must show: (1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione v. Johnson,* 184 Ill.2d 109, 703 N.E.2d 67, 70 (1998); *Van Diest Supply Co. v. Shelby County State Bank ,* 425 F.3d 437, 439 (7th Cir. 2005).  The essence of conversion is not acquisition by the wrongdoer, but the exercise of control over the chattel in a manner inconsistent with plaintiff's right of possession. *Dickson v. Riebling Jensen v. Chicago and Western Indiana R. Co.,* 94 Ill.App.3d 915, 932, 419 N.E.2d 578, 592-593 (1st Dist. 1981).

---

[8] The agreement between the parties may be by implication, which may be gathered from the circumstances surrounding the transaction, such as the benefits to be received by the parties, their intentions, the kind of property involved, and the opportunities of each to exercise control over the property. *Wall v. Airport Parking Co. of Chicago,* 41 Ill.2d 506, 509, 244 N.E.2d 190 (1969); *Chemtec Midwest Services, Inc. v. Insurance Co. of North America,* 279 F.Supp. 539, 547 (E. D.Wis. 1968).

**C.**
**The Evidence Sufficiently Shows That Coakley**
**Took Possession Of DW Data's Servers From OFIS**

The defendant's sole argument on liability under any of these theories is that it never received the servers from OFIS at the time it purchased OFIS's accounts, and therefore the plaintiff loses. DW Data's contractual right to possession of the property gave rise to a constructive bailment or bailment by operation of law, even though DW Data did not and could not have consented until the move from OFIS was over, for it was only then it had notice of what occurred. *See generally*, *Essex Insurance. Co. v. Wright,* 371 Ill.App.3d 437, 441-442, 862 N.E.2d 1194 (1st Dist. 2007); *Lindsey v. State,* 1989 WL 12147731, 1-2 (Ill.Ct.Cl. 1989).

Coakley was entitled and obligated under the 2007 contract with OFIS to take possession of DW Data's property and safeguard it. To that end it was obligated to use at least ordinary care. Bailees will be liable for losses that result from their negligence or, more precisely, from their failure to exercise the skill or knowledge pertaining to the nature of their businesses. *Loman v. Freeman,* 229 Ill.2d 104, 133-134, 890 N.E.2d 446, 46 (2008); *Mayer v. Brensinger,* 180 Ill. 110, 113–14, 54 N.E. 159 (1899). By "assuming" that DW Data's property was being delivered to it and taking no action to ensure that it was, as Mr. Coakley unconvincingly claimed, *see supra* at 6, Coakley, it could be argued, breached its duty of reasonable or ordinary care, thereby causing the loss of the servers, even if it never took actual possession of them. But this is not an argument DW Data makes, and so we move on to address the defendant's argument that it never received the servers.

The invoice generated at the time of DW Data's shipment to the OFIS storage facility in 2002 prominently listed the two servers. (Ex. J). That inventory admittedly was provided to

15

Coakley before the 2007 sale. Nonetheless, Mr. Coakley, who was the chief witness for the "we never received the servers" theory, insisted that no one cross-checked to see if the items on the inventory were actually received by Coakley. I reject that argument and find that the evidence is sufficient to show that defendant received the servers from OFIS.

Mr. Coakley's demeanor at trial alternated between cavalier and evasive. Demeanor and inflection can be critical components of the decision whether to believe a witness. *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."); *United States v. Schiro*, 679 F.3d 521, 532 (7th Cir. 2012); *United States. v. Smith,* 668 F.3d 427, 430 (7th Cir.2012). Indeed, "the demeanor of a witness...may satisfy the tribunal not only that the witness' testimony is not true but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962). Of course, this does not mean that disbelief of a witness is a substitute for proof. It is not. *Cf., Moore v. Chesapeake & O. Ry. Co.,* 340 U.S. 573, 576 (1951); *United States v. Zeigler*, 994 F.2d 845 (D.C. Cir. 1993).

Beyond Mr. Coakley's demeanor was the implausibility and inconsistency of his testimony. *Anderson,* 470 U.S. at 575. He gave three bases for his unyielding conclusion that the defendant had never taken possession of the plaintiff's servers. He testified that he *personally*

walked through OFIS's warehouse prior to the transfer of assets, and that he would have seen the servers had they been there. He also insisted that the servers were not present at Coakley's warehouse after the transfer of the lots from OFIS's facility because he didn't see them, and he claimed Tim Reinke, who oversaw the move, never saw the servers either.

There are problems with Mr. Coakley's testimony. It assumes the servers could not have been contained within a crate, vault, or dense plastic or other packaging. The Sun 6500 server was a tower the size of a small or medium refrigerator, (*see, e.g.*, *Ward Dep.* at 10; *Reinke* Dep. at 23; Vol. 1, Ex. 9, at 3), the 4500 was much smaller. But the containers were 7 feet tall, 7 feet wide, and 8 feet deep. (*Reinke Dep.* at 24). Moreover, as mentioned earlier, when Mr. Morganstern sent Ms. Fogg to Coakley's warehouse in 2008, she couldn't tell what was there because it was wrapped in plastic. (*Morganstern Dep.* at 34). All she could tell was that what was wrapped in plastic wrap was so big it would be hard to fit inside a normal sized truck. (*Id.* at 34). Consequently, even if Mr. Coakley's trial testimony that he visually inspected the OFIS warehouse and never saw any servers was to be credited, which I do not, it does not prove the point he labored to make.

Even more problematic for Mr. Coakley's credibility is when asked during his deposition how he knew that Coakley never physically took possession of the servers, he said, "[b]ecause I talked to Tim Reinke and he verified that we never received those items." (*Coakley* Dep. at 41-42). This alleged conversation was said to have occurred sometime after the plaintiff's claim was filed in 2009 with Coakley and before the present suit was filed. Given Reinke's importance to Mr. Coakley's version of things, one would have expected him to have been listed in the defendant's Rule 26 disclosures and in the answers to interrogatories, signed by Mr. Coakley,

17

himself. He was not, and Mr. Coakley could not explain why. (*Coakley Dep.* at 41-42). This is classic impeachment by omission. *United States v. Useni*, 516 F.3d 634, 652 (7th Cir. 2008).

In any event, while Mr. Reinke did testify at his deposition that he didn't recall ever seeing servers being delivered in 2007 (*Reinke* Dep. at 13), he could not "guarantee" he was present for every single delivery "on any given day." (*Id.* at 13-22). And even if Mr. Reinke was present for every delivery, as discussed earlier and as Mr. Reinke himself explained, most items that came off the trucks were in large, sealed, crates that were indistinguishable from each other without looking at their tags, which only denoted the owner of the crate. (*Id.* at 21). Mr. Reinke noted that if a server were the size of a small refrigerator, it could fit inside one of the closed crates received from OFIS. (*Id.* at 23-24).[9]

Finally, there is Mr. Coakley's vacillating, evasive and implausible testimony that no one inventoried the items from OFIS or cross checked to be sure Coakley got what it contracted to buy from OFIS. Mr. Coakley, a successful and sophisticated business man, was also a lawyer, who had been a state court prosecutor for more than a decade.[10] Although he admitted he had a precise inventory of what OFIS had in storage for DW Data that clearly showed the servers (Ex. J), he claimed that to have performed any sort of check at the time of the sale and transfer of lots

---

[9] Mr. Reinke's hand-drawn diagram allegedly made after everything had been delivered from OFIS, and created for the sole purpose of knowing where crates were located in Coakley's warehouse proves little, other than that one storage lot and one "speed pak" belonged to DW Data. Equally unhelpful is a Coakley's "Warehouse Location Form" dated 4/1/07, with the customer name of DW Data, the location of fourth floor of building 2nd, and the handwritten notation: "l-vault, 1-sp pk." (*Vol. 1*, Ex. G). A vault was 7x7x8 feet in dimension.

[10] According to the defendant's website, the letter of April 19, 2007 to DW Data, and Mr. Coakley's deposition, Mr. Coakley is certainly successful, owning multiple, large storage facilities. (*Vol. 1,* Ex.K ). Mr. Coakley graduated from Marquette Law School in 1981, served as the elected District Attorney for Lincoln County, Wisconsin for 7 years, and a prosecutor in Kenosha County for 5 years.

from OFIS would have posed "insurmountable" problems. He then changed his story to say that it wasn't because of any insurmountable problem that no check was performed to see if what was being transferred matched the OFIS inventory, but because he just "assumed" that what he got from OFIS matched the inventory for DW Data's equipment (Ex. J) and for OFIS's other customers. However, he also said that he had no idea what OFIS had of DW Data's, and that he was "not sure if everything on the inventory was there" or even if the inventory was accurate. (*Coakley Dep.* at 11-21, 24, 35-37, 41-44). The point apparently being, why check at all.

"[L]ong before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact finders are permitted to do the same...." *Texas v. Brown,* 460 U.S. 730, 742 (1983). And, so too, are judges. Common sense and human experience – which always have a role to play, *United States v. Montoya De Hernandez,* 473 U.S. 531, 542 (1985); *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir. 1992) (Breyer, C.J.); *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir. 2009); Posner, How Judges Think, 116 (Harv. Univ. Press 2008) – strongly counsel in favor of rejecting Mr. Coakley's trial testimony and finding it not credible.

In common experience, successful businessmen who are also experienced lawyers are not so trusting and insouciant in their business dealings as Coakley claims he was in the OFIS deal. They are aware of the idea captured in the hoary maxim, *caveat emptor*, that buyers have a responsibility to watch out for their own interests. *Trident Inv. Management, Inc. v. Amoco Oil Co.*, 194 F.3d 772, 773 (7th Cir. 1999). And being a lawyer as well as a businessman, it is highly unlikely that Mr. Coakley was as blasé as he professed to have been in connection with the OFIS purchase. It is at least a fair inference that as a man in the business of storing other peoples'

property and as an experienced lawyer, Mr. Coakley knew his responsibilities and potential liabilities to all those whose contracts he was buying from OFIS and thus would not have been so boldly indifferent to those obligations as he professed at trial and in his deposition. Moreover, those protestations were inconsistent with the proof that the defendant indeed had a practice of inventorying and checking the items going into and out of the Coakley facilities. But there is more than reasonable inference at play here.

On April 19, 2007, Mr. Coakley signed and sent a letter to DW Data explaining that OFIS had ceased operations and that Coakley had "purchased the majority of the assets of OFIS, Inc." The letter, whose purpose was to notify DW Data (and other customers) of what was happening with their stored items and to keep their business (*Isnard Dep*. at 8; *Coakley Dep*. at 20), did not say Coakley wasn't sure what it had. Nor did it ask DW Data to come and check to see what floor space was being occupied so that a storage rate could be arrived at. Quite the contrary. The letter unqualifiedly stated that "[a]mong the assets purchased were the vaults containing the goods that [DW Data] [was] storing with OFIS, Inc." (*Vol. 1,* Ex. 17*; see also, Coakley* Dep. at 18-19). The letter emphasized that Coakley had "all the paperwork relating to [DW Data's] storage agreement with OFIS, Inc. and [would] be honoring that agreement in its entirety." (*Vol. 1,* Ex. 17). Part of that paperwork admittedly included the detailed inventory prepared by National Van Lines that prominently listed the servers. (*See* Ex J).

It does not come with good grace for Mr. Coakley to attempt to say at his deposition and at trial that the letter did not mean what it said, and I reject that testimony. And I also reject his claim and that of his employees that they did not know the author of the letter. (*Isnard Dep*. at 6-7; *Kowalski Dep*. at 21; *Coakley Dep*. at 18-19).

20

The letter went on to say that Coakley would continue to charge the same amount DW Data had been charged by OFIS, which was based on the square footage occupied by the stored items at OFIS, which included the servers. And indeed that is what happened. (*Coakley Dep.* at 43). But if the servers and the two copiers (which Coakley also claimed were not turned over by OFIS) were not received from OFIS then the square footage needed to store DW Data's items should have been less than what it was at OFIS, and one would have expected the monthly charge to have been reduced *pro tanto*. It was not.

A document that would have shed light on what Coakley received from OFIS was Exhibit A to the Asset Purchase Agreement. The APA, prepared by Mr. Coakley, according to his trial testimony, provided that Coakley was purchasing from OFIS "[e]verything included in Exhibit A *table of contents* attached hereto and incorporated by reference" with four specified exceptions not relevant here. (Emphasis supplied). The defendant failed to produce Exhibit A in discovery, because, according to Mr. Coakley's trial testimony, Exhibit A was never prepared; it somehow "slipped through the cracks." I find Mr. Coakley' testimony in this regard not credible.[11]

"The rules of evidence in the main are based on experience, logic, and common sense...." *Donnelly v. United States*, 228 U.S. 243, 277-78 (1913). That is certainly true of the rule that allows an adverse inference to be drawn from nonproduction of evidence uniquely available to

---

[11] At his deposition, Mr. Coakley claimed he did not know who the author of the APA was: "Unfortunately, it was about four years ago, so I don't know if it was drafted by myself or if it was drafted by one of the partners of OFIS." When confronted at trial with his prior deposition testimony, Mr. Coakley said he "did not recall testifying that way or not." The deposition was in 2009. His claimed inability to recall what occurred at the deposition is a further factor to be considered in assessing the truthfulness of his claimed vivid recall at trial in 2012 of having walked through the OFIS facility in 2007. *See Pinpoint, Inc. v. Amazon.Com, Inc.*, 2004 WL 2792012, 2 (N.D.Ill. 2004)(Posner, J., sitting by designation)(discussing selectivity of recollections as implausible).

one party.  Given the evidence in this case, it is a reasonable inference that Exhibit A was not

produced by the defendant, not because it was never prepared as Mr. Coakley unconvincingly

testified,  but because had it been produced, it would have been adverse to the defendant. *See*

*Graves v. United States*, 150 U.S. 118 (1893); *U.S.O. Corp. v. Mizuho Holding Co.,* 547 F.3d

749, 753 (7th Cir. 2008); *Miksis v. Howard*, 106 F.3d 754, 763 (7th Cir. 1997);  *Niehus v. Liberio*,

973 F.2d 526, 531 (7th  Cir. 1992); *United States v. Blakemore*, 489 F.2d 193, 195 (6th Cir. 1973).

In sum, the evidence sufficiently shows that Coakley did receive the servers from OFIS.

(*Coakley* Dep. at 36-37).

## D.
## The Plaintiff Proved By A Preponderance Of The Evidence That
## The Oracle 8i Software Was Installed On The Sun Servers

The defendant's second line of defense is that even if the plaintiff proved that the

defendant received the Sun servers from OFIS, it has not proven that the Oracle software was

installed on them, and that no inference can be drawn that it was. (*Def.'s Trial Brief*, at 3-4;

*Def.'s Proposed Findings of Fact and Conclusion of Law*, at 2-3).[12] While there is no direct

evidence that the software was installed, circumstantial evidence is every bit as probative as

direct evidence and in some cases may be more certain, satisfying and persuasive than direct

evidence. *Michalic v. Cleveland Tankers, Inc*., 364 U.S. 325, 330 (1960).  And, of course, the

finder of fact can use common sense "to evaluate what reasonably may be inferred from

circumstantial evidence." *United States v. Rose,* 12 F.3d 1414, 1421 (7th Cir. 1994). Even if

Illinois evidentiary principles had a role to play in this case, as the defendant seems to suggest,

---

[12] If that argument is right, the damages are at best under $10,000, which the parties agree is the fair market
value for a comparable replacement  server.

those principles are the same. *See also, Olson v. Williams All Seasons Co.,* 974 N.E.2d 914, 921 (2nd Dist. 2012)("'Circumstantial evidence is the proof of facts and circumstances from which a [fact finder] may infer other connected facts which usually and reasonably follow, according to the common experience of mankind.'"); *Harris Trust & Sav. Bank v. Otis Elevator Co.,* 297 Ill.App.3d 383, 392, 696 N.E.2d 697, 704 (1st Dist. 1998)(same).

But, as with any evidence, mere speculation is forbidden. *Wallace v. McGlothan,* 606 F.3d 410, 420 (7th Cir. 2010); *Amrhein v. Health Care Service Corp.* 546 F.3d 854, 859 (7th Cir. 2008); *Tragarz v. Keene Corp.*, 980 F.2d 411, 418 (7th Cir. 1992). And evidence that is equally consistent with two competing hypotheses is insufficient to prove the point for which it is offered, *Szymanski v. County of Cook,* 72 Fed.Appx. 451, 455 (7th Cir. 2003), since, by definition, a choice between equally balanced alternatives would necessarily be speculative. However, "[c]ircumstantial evidence does not need to exclude all other possible inferences or support only one logical conclusion." *Olson v. Williams All Seasons Co.,* 974 N.E.2d 914, 921 (2nd Dist. 2012); *Harris Trust & Sav. Bank v. Otis Elevator Co.,* 297 Ill.App.3d 383, 392, 696 N.E.2d 697, 704 (1st Dist. 1998)(same). The only question is whether the evidence, be it circumstantial or direct, has sufficient probative force to warrant the inference sought to be drawn.

The servers were purchased in January 2000 and shipped to Exodus Communications to be hosted. (*Vol. 1*, Ex. 1). Exodus was not a software installer, but an internet hosting service. About a month after that, DW Data paid for thirty-six months of maintenance for both servers. (*Vol. 1*, Ex. 15). The Oracle software/license purchased for one million dollars, a month after the servers were bought, was, as the defendant's expert concluded, purchased specifically to run

on the particular Sun servers the plaintiff purchased for about half a million dollars. (*Vol. 1*, Ex. 3).[13] The software came with only one year of Oracle support, which DW Data then extended for a year. (*Wright Report* at 2-3). It was not until December 2002 when the company was having financial issues that the servers were placed in storage.

It is a reasonable inference that having made a total investment of $1.5 million for the Oracle software/license and the servers, DW Data would have installed the software or had it installed at some point over the next two years before they were placed in storage. Moreover, in his deposition, the plaintiff's expert, Michael Pellegrino, testified, without objection or motion to strike, that it was his understanding that DW Data had the servers "up and running" prior to the time they were put in storage. (*Ex. 11* at 49). The deposition, along with all of the other depositions, was offered and received at trial without objection, and no objection was raised in the defendant's post trial submission.

Contrary to the defendant's argument, the conclusion that the software was loaded onto the servers is not undercut by the fact that when the Oracle software was purchased it was shipped to DW Data's office rather than to Exodus Communications where the servers were being hosted. (Ex. 3). The fact that the software was shipped to the plaintiff's place of business rather than to Exodus makes perfect sense. Exodus was not an installer but an internet hosting company and internet service provider. As the purchaser of the software, the plaintiff was

---

[13] The defendant's expert, Ms. Wright, noted that, "[t]he initial cost of licensing for the two Sun Servers (E6501 and E4500) to run Oracle software was $1,049,538.35 purchased by [DW Data] on March 9, 2000." (*Wright Report,* at 2). The licensing metric used for the purchase – "Power Units RISC" – is the license metric used for Solaris, which was, at the time, Sun Microsystem's proprietary Unix operating system; so without question the Oracle software was purchased to run on a Sun server. (*Id.* at 2, 4) (*E.g.*, "8i Media Kit … on Sun Solaris").

responsible for installing it under its agreements with Oracle – a fact pointed out in the defendant's Proposed Findings of Fact and Conclusions of Law. [Dkt. #59 at 1,3]. Thus, it would have been odd to have had the software shipped to Exodus rather than the plaintiff.

In short, the evidence is not in equipoise, and I find that although the question is closer than the plaintiff would concede, the circumstantial evidence is sufficient to allow me reasonably to conclude that the Oracle software was installed on the servers before they were placed in storage with OFIS in December 2002.

This, I find the plaintiff has proven by a preponderance of the evidence that it is entitled to recover under its bailment and breach of contract claims, but not its conversion and promissory and equitable estoppel claims. There is simply no proof of unauthorized possession – the plaintiff having ratified the defendant's OFIS purchase by continuing the storage contract with Coakley – or proof of a knowing misstatement that resulted in harm to the plaintiff.

## IV.
### Coakley's Mitigation and Causation Arguments

An alternative argument advanced by the defendant is that the plaintiff's failure to have maintained the original software disks or copies and/or to have continued making its service payments to Oracle between 2002 and 2009 – which would have been staggeringly high (*"Defendant's Pretrial Memorandum"* at unnumbered pp. 3-4) – is the "proximate cause" of its loss. Thus, the argument goes, the defendant is not liable for anything beyond the small cost of a replacement server. *(Def's Proposed Findings of Fact and Conclusions of Law* at 3)[Dkt. #59]; *Def's Trial Brief* at 4)[Dkt. #57]. The proximate cause argument is unsupported, conclusory, and undeveloped and thus waived. *United States v. Irons,* 712 F.3d 1185 (7th Cir. 2013); *Puffer v.*

*Allstate Insurance. Co.*, 675 F.3d 709, 718 (7th Cir. 2012); *Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720-21 (7th Cir. 2008).

Moreover, this "but for" causation argument – and, at bottom, that is what the argument necessarily is – is based on a misunderstanding of proximate cause. Merely because one event is linked to another event does not mean that the law recognizes the one as the cause of the other. "Most but-for causes aren't considered causes at all." *United States v. Hatfield*, 591 F.3d 945, 948 (7th Cir. 2010). *See the discussions in Hatfield*; *James River Insurance Co. v. Kemper Cas. Insurance Co.*, 585 F.3d 382, 386-87 (7th Cir. 2009); *Movitz v. First National Bank of Chicago*, 148 F.3d 760, 762 (7th Cir. 1998).

As plaintiff's counsel put it in her post-trial oral presentation, the defendant is essentially arguing that the plaintiff had a duty to anticipatorily mitigate its damages by making copies of the software when the servers were placed in storage in 2002 just in case the servers might be lost years later. I reject that argument as have other courts presented with it. *See e.g., Miller v. Jeffrey,* 213 W. Va. 41, 44, 576 S.E.2d 520, 523 (2002); *Tonetti v. Barth,* 48 Conn.Supp. 54, 68-69, 829 A.2d 453, 462 (2003).

Under Illinois law, mitigation of damages is an affirmative defense on which the defendant bears the burden of proof. *Ellis v. Sheahan*, 412 F.3d 754, 756 (7th Cir. 2005); *Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 688 (7th Cir. 1985); *Mikus v. Norfolk and Western Ry. Co.*, 312 Ill.App.3d 11, 32, 726 N.E. 2d 95, 112 (1st Dist. 2000). As Judge Posner has explained, mitigation of damages in contract law corresponds to "avoidable consequences" in tort law. "Both these doctrines, however, are primarily concerned with efforts by victims of a breach of contract or a tort, *exerted after the breach or tort has occurred*, to minimize the harm."

*Outboard Marine Corp. v. Babcock Industries, Inc.,* 106 F.3d 182, 184 (7th Cir. 1997)(Emphasis supplied). *See also Moran Foods, Inc. v. Mid-Atlantic Mkt. Dev. Co., LLC,* 476 F.3d 346, 440 (7th Cir. 2007); *Clarkson v. Wright,* 108 Ill.2d 129, 133, 483 N.E.2d 268, 270 (1985); *Amalgamated Bank of Chicago v. Kalmus and Associates, Inc.*, 318 Ill.App.3d 648, 658-59, 741 N.E.2d 1078, 108, (1st Dist. 2000).[14]

Plainly, the defendant's conclusory mitigation argument fails, since the prophylactic action the defendant claims the plaintiff should have taken in 2002 when the servers went into storage long antedated the loss. The same is true of the argument that the plaintiff's failure to have paid support fees to Oracle between 2002 and 2009 is another cause of the plaintiff's harm. While Oracle allows customer upgrades to the latest version of its software where the customer has paid the annual service and support fees, in the instant case those fees would have been 22% of the purchase price of the original software and license for each year between 2002 and 2009. In this case that would be approximately $2 million, thus far exceeding the $200,000 for updated software and accompanying license. (*Wright Dep. at* 15-17, 73; *Morganstern* Dep. at 63-65).

The doctrine of mitigation of damages would not require the plaintiff to now pay this sum, even if Oracle would allow it to do so – which it would not. (*Wright Dep.* at 58, Ex. 1). The victim of a breach is only required to "'exercise reasonable diligence and ordinary care in attempting to minimize the damages after injury has been inflicted.'" It need not take action that involves "undue risk or burden." *East St. Louis School Dist. No. 189 v. Hayes,* 237 Ill.App.3d

---

[14] While the defense is couched in the language of obligation or duty, *see e.g.*, C. Fried, Contract as Promise 131 (1981), the formulation is misleading: a plaintiff incurs no liability for failing to act. Rather, the amount of loss avoidable by stopping performance or making substitute arrangements following a breach is merely subtracted from the amount otherwise recoverable as damages. *McClelland v. Climax Hosiery Mills*, 252 N.Y. 347, 358 (1930) (Cardozo, C.J., concurring); *St. George Chicago, Inc. v. George J. Murges & Assoc.*, 296 Ill.App.3d 285, 293 (1st Dist. 1998.).

638, 644, 604 N.E.2d 557, 562 (5th Dist.1992); *R.R. Donnelley & Sons Co.*, 641 F.Supp.2d at

717 (collecting cases).

In sum, DW Data has suffered a loss due to the acts and omissions of C. Coakley

Relocation Services. The issue to be determined is what the damages should be.

## V.
## DAMAGES

### A.
### General Principles And The Parties' Positions

Under Illinois law, the measure of damages for breach of contract is the amount which

will compensate the injured party for the loss that either fulfillment of the contract would have

prevented or which the breach of it has entailed. *Harden v. Playboy Enters., Inc.,* 261 Ill.App.3d

443, 453, 633 N.E.2d 764 (1ˢᵗ Dist. 1993). The purpose of damages is not to punish but to put the

nonbreaching party into the position it would have been in had the contract been performed. *Id.*

at 454; *Sharon Leasing, Inc.,* 299 Ill.App.3d at 356-57, 701 N.E.2d at 115. A plaintiff must

establish by a preponderance of the evidence that it sustained damages and "a reasonable basis

for computation of those damages." *Gill v. Foster,* 157 Ill.2d 304, 313, 626 N.E.2d 190, 194

(1993). "Damages may not be awarded on the basis of conjecture or speculation." *Telemark*

*Dev. Group v. Mengelt*, 313 F.3d 972, 983 (7ᵗʰ Cir. 2002).

The measure of damages for breach of a bailment under Illinois law is the value of the

property at the time of its demand or loss. *Cushman v. Hayes,* 46 Ill. 145, 1867 WL 5348, 7

(1867); *Winfield Design Assocs., Inc. v. Quincy Jefferson Venture,* 581 F.Supp. 21, 22–23

(N.D.Ill. 1984); *Mueller v. Softer,* 160 Ill.App.3d 699, 706–707, 513 N.E.2d 1198 (5ᵗʰ Dist.

1987). Generally, the amount of damages the plaintiff may obtain will be measured by the fair

market value of the items lost or damaged. The fair market value of a good is defined as the price a willing buyer would pay a willing seller, both being aware of all of the relevant surrounding circumstances, and neither being under a compulsion to buy or sell and not acting collusively. *See United States v. Cartwright*, 411 U.S. 546, 551 (1973); *Walsh v. Prop. Tax Appeal Bd.*, 181 Ill.2d 228, 229 (1998); *Bloomington Public Schools, District No. 87, McLean County, Ill. v. Illinois Property Tax Appeal Bd.*, 379 Ill.App.3d 387, 389, 886 N.E.2d 362, 364 (4th Dist. 2008); 24 Williston on Contracts § 64:4 (4th ed.).

Often, however, fair market value cannot be ascertained, for there may be no market or the price may be difficult to determine. In that event, a court may award damages using some other reasonable calculation of value, such as replacement cost. *B & Y Heavy Movers, Inc. v. Fluor Constructors, Inc.*, 211 Ill.App.3d 975, 985 (1st Dist. 1991); Ill. Law and Prac., Bailments §25 (2012). This principle has been applied to Oracle software. *See*, *IBD Inc. v. Enterprise Business Solutions, LLC*, 203 P.3d 1281 (Kan.App. 2009), where the evidence was that an Oracle software license was "worthless on the market." But these are not inflexible concepts, and, "[t]he ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." *Standard Oil Co. of New Jersey v. S. Pac. Co.*, 268 U.S. 146, 156 (1925).

In this case, the servers were to be delivered to DW Data on November 13, 2009. (*Morganstern Dep. at* 49). Thus, if there is a legitimate and ascertainable market for the Oracle 8i software – and the market must be legitimate, *United States v. Coviello*, 225 F.3d 54, 63 (1st Cir. 2000) – the plaintiff would be entitled to the fair market value of the missing items at about that time, since the date of loss is unknown.

The defendant's sole argument is that the plaintiff's perpetual license to use Oracle 8i software is still in place, and since the defendant's expert, Ms. Wright, was able to buy software disks (i.e. a "media kit") for the Oracle 8i software for $90 from a business acquaintance, the fair market value of the software (as distinguished from the required license to use the software) is $90. That, plus the relatively small cost of replacing the servers, plus the costs of installation of the software, totals approximately $35,000. Unfortunately, the defendant has not cited a single case that would support its conclusory argument or its expansive construction of the plaintiff's Oracle license.

The plaintiff's position is that since Oracle no longer sells or supports the 8i software, (*Wright Dep* at 73), and since the software cannot be purchased on the open market, the plaintiff's perpetual license will not permit it to use Ms. Wright's disk (or any other 8i disk obtained from a private party – even if it was available). Thus, the correct measure of damages cannot be the fair market value of 8i software – there being in effect no market for it – but rather the amount required to purchase the currently available, comparable software, with its attendant license. That, it insists, is not a windfall, but merely a restoration to the position it would have enjoyed had its servers and software not been lost.

## B.

### The Oracle 8i Software Does Not Have A Fair Market Value

In support of its damage theory and calculations, the defendant submitted the report of Lisa Wright. Ms. Wright's qualifications include twelve years of experience selling Oracle technology, claimed recognition as an authority on Oracle licensing requirements, and certification through Oracle as a sales professional. (*Wright Report,* at 5). Ms. Wright is an

employee of Avout Inc., a certified Oracle partner. Ms. Wright's report, titled "DW Data v. Coakley Determining the Replacement Cost of an Oracle System," put the replacement cost of the lost items at $37,835.00. She valued the servers at $12,145.00 based on Mr. Morganstern's deposition, and she estimated the cost of installing the software onto new servers at $22,000.00, plus $3,600.00 for incidental expenses. (*Wright Report,* at 4-5; *Vol. 2,* Ex. 9, at 3-4).

In her report, under the heading "Opinion as to Replacement Cost: Oracle Software," Ms. Wright differentiates between the software license, which gives the purchaser the "right to run the Oracle software" and the software media kit itself, which is the "technology product" installed pursuant to the license. (*Wright Report,* at 3-4). *But cf., United States v. Ameri,* 412 F.3d 893, 900 (8th Cir. 2005)("the software was not generally available for sale separate from an installation contract so there was not a verifiable 'fair market value'"). Ms. Wright opines that since the plaintiff's license to use the software is perpetual, "a media kit is all that is needed to compensate for replacement" and that she says the plaintiff can purchase on the open market for $90.00. (*Wright Report,* at 3-4).

In support of the $90.00 figure – which Ms. Wright calls the "replacement cost," not the "fair market value" of the software, (*Wright Report* at 70), even though the defendant says the purchase "was to show fair market value of the software," Defendant's Trail Brief at 8 [Dkt. #57], Ms. Wright discusses her purchase of discs containing the Oracle 8i software from Dan Mellish, whom she described as "[a] private party...[who] is a business associate for an Oracle . . . Distributor." (*Wright Report,* at 3-4). But that description in the report is somewhat misleading if it was intended to convey the impression that Ms. Wright purchased the software through an "Oracle Distributor." In fact, she purchased it directly from Mellish, whom she had known since

31

2004. That Mr. Mellish was a business associate for an Oracle Distributor is meaningless in the context of this case.

At her deposition, Ms. Wright admitted that she considered her purchase of the software disk "to be a personal transaction as opposed to [one] involved with [the seller's] position at Avnet." (*Ex. 1 Wright Dep.* at 26). Where Mellish got the disk was unknown, and Ms. Wright did not ask. Ms. Wright paid for the software with a personal check made out to Mellish, not to Avnet. (*Ex. 1 Wright Dep*. at 24). Finally, Ms. Wright answered in the affirmative when asked the question at her deposition: "[The private party] was not selling it to you as a representative of [the Oracle distributor by whom he was employed], correct"? (*Ex. 1 Wright Dep*. at 26).[15]

Ms. Wright conceded that to put the plaintiff in the same position as it was before the software and servers were lost, the replacement software must not violate Oracle's licensing agreements. (*Ex.* 1, *Wright Dep.* at 33). Yet, significantly, the provenance of the software disks purchased by Ms. Wright from her friend is unknown, and there was no claim Mellish had a license from Oracle for the software or permission to sell the software to Ms. Wright or anyone else.

Where and how he obtained the disks is a mystery. All that Ms. Wright could say was that "most likely [the software disk] in his personal possession [was] something he acquired along the path of his either employment or working" and that he "may have also collected [the software disk] for his own personal use." (*Wright Dep*. at 24-25). But that speculation is not informative and in any event is not a substitute for proof. *In re Cohen*, 507 F.3d 610, 614 (7th

---

[15] Despite the defendant's knowledge of the circumstances of Ms. Wright's acquisition of the 8i software from Mr. Mellish, the defendant's lawyer in his deposition of the plaintiff's expert, Mr. Pellegrino, misrepresented that the software that the defendant had obtained for $90 "was purchased from Avnet Technology Solutions." (*Ex. 11, Pellegrino Dep.* at 45).

Cir. 2007); *Louth v. McCollum,* 424 F.3d 631, 634 (7th Cir. 2005); *United States v. Landry,* 257 F.2d 425,431 (7th Cir. 1958).

The source of the disks is important for, as the plaintiff's expert testified without contradiction, counterfeit software disks are common in the marketplace, (*see Ex. 11, Deposition of Michael Pellegrino* at 28, 32, 34-40, 44, 56-57), and reported decisions show that software is often stolen and sold illegitimately. *See e.g.*, *United States v. Ameri*, 412 F.3d 893, 900 (8th Cir. 2005); *United States* v. *Coviello,* 225 F.3d 54, 63 (1st Cir. 2000). And without more information, one cannot know whether the person who sold or gave the disks to Mr. Mellish had a license and whether Oracle gave permission for the disks to be transferred.

Significantly, Ms. Wright's business acquaintance was the only person who responded to Ms. Wright's inquiry on LinkedIn. (*Ex. 1 Wright Dep.* at 20-21). This is hardly the kind of marketplace the law requires. *See United States v. Branch Coal Corp.*, 285 F.Supp. 514, 518 (D. Pa. 1968); *Dohrmann v. Comissioner,* 19 B.T.A. 507, 516 (1930), *reversed on other grounds by stipulation of the parties*, 56 F.3d 1081 (9th Cir. 1081). Fair market value requires "contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market." *Standard Oil Co. of New Jersey,* 268 U.S. at 155. Had there been a real market for the software there should have been multiple responses to her offer to purchase the software. That plainly did not occur here, and, the relationship between the buyer and seller and the setting in which the purported "sale" occurred – in the midst of litigation – further counsels against the conclusion that this was a sale on an open market.

Finally, perhaps the most compelling evidence that there is not a market for Oracle 8i software comes from Ms. Wright, herself. First, Ms. Wright did not buy the disks from Avnet or

Avout, or any other Oracle affiliate as she surely would have if the software was available through a legitimate and authorized channel. And she has conceded that the software is not available from Oracle. (*Wright Deposition* at 73). Second, had there been an active and discernable market for the software, so experienced an Oracle professional as Ms. Wright says she is would have been familiar with it, and her report would have described that market. It did not, and that silence is telling. *Compare Muhammad v. Oliver*, 547 F.3d 874, 877 (7th Cir. 2008) (Posner, J)("[I]f there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening.").[16]

The best Ms. Wright could do in this regard was to add, at the request of the defendant's lawyer, a sentence in the second draft of her Report stating that in addition to Mr. Mellish, "other private parties may also have this media kit available." (Ex 4 at 4).[17] The statement is not only utterly speculative, it is meaningless. "'Anything is possible; there are no metaphysical certainties....'" *United States v. Hendrix,* 482 F.3d 962, 966 (7th Cir. 2007). But that is not the test of evidentiary sufficiency or persuasiveness. On the present record, it is infinitely more probable that 8i software disks are not available for the asking (or buying) than that they might be. Ms. Wright's addition to her expert report shows that all too often experts are "the mere paid advocates or partisans of those who employ and pay them, as much so as the attorneys who

---

[16] *See also* Jean Edward Smith, John Marshall: Definer of a Nation (1996)("More than five weeks have elapsed since the Supreme Court declared the necessity of proving the fact, if it exists. Why is it not proved? Chief Justice Marshall said he could not assume that the government was remiss in seeking the proof; the only conclusion was that the evidence did not exist.").

[17] Ms. Wright admitted at her deposition that the second draft report was prepared at the defendant's lawyer's request and that there were several additions to that draft which were included at counsel's request. (*Wright Dep* at 35-36).

conduct the suit..." *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 382 (7th Cir. 1986).[18]

At bottom, Ms. Wright's report is essentially a legal opinion regarding the operation of Oracle software licenses. And her attempt to bifurcate the value of the license and the value of the media kit to arrive at a supposed fair market figure of the software is misguided. The license is indispensable to the legitimate and lawful use of the media kit, and the software it contains. If the plaintiff cannot use the software Ms. Wright obtained, it is idle and analytically beside the point to say that the value of the media kit is $90.

## C.

### The Plaintiff's License Does Not Allow It To Use The Software Purchased By Ms. Wright

The question then is whether the plaintiff's license for the 8i software it purchased from Oracle in 2000 permits it to run the software that Ms. Wright obtained from a business acquaintance in a purely private transaction or some other equivalent private source. Ms. Wright's inquiry to Oracle in connection with the preparation of her expert report on this question is not helpful to the defendant. In an email to Oracle she posed the following question: "Could they use these licenses today if they *still had* the 8i media and wanted to run 8i DB without renewing Annual Support or buying new licenses?" (*Ex.* 8)(Emphasis supplied). "In law as elsewhere the answer to a problem largely depends on the way the question it presents is put.

---

[18] Ms. Wright's allegiance to her employer in this case is further illustrated by her stubborn refusal to answer a simple question at her deposition. She was asked whether, assuming that the use by DW Data of Oracle 8i software disks obtained from a private party would be violative of the Oracle license, the plaintiff would be made whole merely because a an 8i media kit could be found. She refused to assume for the sake of the question that such use might be impermissible. (*Ex.* 1, Wright Dep. at 28-33). Later in the deposition she finally conceded that the plaintiff would not be made whole in that event. *See* 32, *supra.*

A wrong question is not likely to beget the right answer." *In Re Sawyer*, 360 U.S. 622, 649 (1958)(Frankfurter, J., dissenting). And Ms. Wright asked the wrong question, thereby making Oracle's answer irrelevant.

She knew that "they" did not "still have" the software disks, and no one disputed that if the plaintiff had the original disks or a copy, its license would allow it to run the software. The real question, as Ms. Wright knew, was whether the plaintiff's license would allow it to run Oracle 8i software purchased from a private party – especially where it was not known how the seller acquired the software – without Oracle's consent. But those facts were not included in Ms. Wright's tendentiously phrased question.

At the threshold, it is helpful to analysis to discuss the significant economic role licensing plays in Oracle's business model and that of all major software manufacturers. Oracle is the second largest software company on Earth. It specializes in developing, making, selling, distributing, and servicing computer software that helps businesses, government agencies, and other complex organizations manage themselves. The most important driver of Oracle's profitability is its software licensing business. In fiscal 2000, licensing was responsible for 44% of the company's total revenues. The reason that licensing is important is that Oracle's other revenues are largely derivative of a customer's original decision to buy a license to use Oracle software. Thus, in fiscal 2000, Oracle derived 29% of its revenues from support services it provided to users of its software, 22% from training personnel who consult with users of its software, and 5% from providing education about the use of its software. *In re Oracle Corp. Derivative Litigation,* 2004 WL 2756278, 4 (Del.Ch.2004), *opinion amended and superseded on other grounds, In re Oracle Corp. Deriviative Litig.*, 2004 WL 2847876 (Del. Ch. 2004).

Not surprisingly, therefore, the plaintiff's license agreement with Oracle contains a standard prohibition against transferring the license or the programs to another person: "You may not . . . give the programs or an interest in the programs to another individual or entity." (*Vol. 1,* Ex. 21, at 3). The defendant does not contend that this is a provision unique to the plaintiff's license or even to Oracle and, indeed, it is not. (*See Ex. 7* at 1). *See, e.g., SQL Solutions, Inc. v. Oracle Corp.*, 1991 WL 626458 (N.D. Cal. 1991); *ITOFCA, Inc. v. Mega Trans Logistics, Inc.,* 322 F.3d 928, 930 (7th Cir. 2003); *Microsoft Corp. v. Big Boy Distribution LLC,* 589 F.Supp.2d 1308, 1313 (S.D.Fla. 2008); *In the Matter of Buildnet, Inc.*, 2002 WL 31103235, 5-6 (M.D.N.C. 2002); *Dechert LLP v. Com.*, 922 A.2d 87, 89 (Pa.Cmwlth.,2007). *Cf,. H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.* 694 F.3d 827, 835 (7th Cir. 2012)("In licensing agreements for trademarks and other intellectual property, the licensor generally wants to maintain control of the intellectual property. One important means for doing so are restrictions on the licensee's ability to transfer or assign its rights under the license to third parties who may be unknown or even hostile to the licensor.").

Plaintiff's non-exclusive, perpetual  license with Oracle granted DW Data the right to use the program solely for its business operations.  The license provided that Oracle retained all ownership and intellectual property rights to the programs.  It allowed DW Data to make a sufficient number of copies of each program for its licensed use and one copy of each program for backup purposes when the system is inoperative.  Any additional copies had to be approved by Oracle. The license prohibited transfer of the programs to another individual or entity.  (*See Ex. 21*). Likewise, 17 U.S.C. §117 permits a licensee to make copies of computer software for

use in the licensee's business, and such copies may only be transferred as part of the lease sale or other transfer of all rights in the program.

That the plaintiff's license did not give it the right to use copies of the software acquired from a third person is shown by the defendant's Revised Expert Report, in which Ms. Wright notes that in forming her opinions she relied on the Oracle License and Service Agreement and the Oracle Software Investment Guide. (*Ex. 4* at 5). The Guide contains a section entitled Licensing Overview. (*Ex. 5* at 8). It provides that by placing its order with Oracle to purchase software, the customer accepts the License and Service Agreement and the Ordering Document. The Guide provides that "[u]pon payment for services, you will have free, perpetual, limited right to use for your internal business operations anything developed by Oracle and delivered to you *under this agreement*...." (Emphasis supplied). Obviously, a copy of the 8i software purchased from some private party is not something "delivered under" the Agreement between the plaintiff and Oracle.

The Oracle License and Service Agreement permits the buyer to make a sufficient number of copies of each program for its own use. However, the buyer cannot "make the programs or materials resulting from the services available in any manner to any third party for use in the third party's business operations" (unless such access is expressly permitted for the specific program license or materials from the services you have acquired)." The plaintiff's expert, Mr. Pellegrino, testified that based upon the documents that he reviewed and sample language on Oracle's website, which is not unlike other Oracle documents he has reviewed, Oracle prohibit the sale, transfer, or ownership of licensed software to a third party, (*Ex. 11, Pellegrino Report* at 17).

38

Given the ubiquity of non-assignment and transfer clauses in software leases, the plain terms of the Oracle license, and the clarity of the Oracle documents on which Ms. Wright relied in her Revised Report, Ms. Wright's adamant but unexplained insistence in her deposition that plaintiff's use of the media kit that she procured from Mr. Mellish would not violate the plaintiff's license is not credible. (*Vol. 2, Ex. 1*, *Wright Dep.* at 29 – 31). "'An opinion has a significance proportioned to the sources that sustain it.'" *Huey v. United Parcel Service, Inc.,* 165 F.3d 1084, 1087 (7th Cir. 1999). Ms. Wright's opinion has nothing beyond her unsupported conclusion to sustain it, and it is rejected.

It is clear that the plaintiff's license only covered the software "delivered under the agreement," not to 8i software in the abstract, no matter its source. Whether Mr. Mellish had a license or not – and he plainly didn't –  his purported sale to Ms. Wright of the 8i software disk was illegitimate. How many illegitimate  transfers may have preceded Mr. Mellish's transfer to Ms. Wright is uncertain since there is no way to know how many hands the software disks passed through before Mr. Mellish came into possession of them. What is certain is that these mesne conveyances were not authorized by Oracle.

What all this shows convincingly is that there is no fair market value that can be ascribed to Oracle 8i software, and that the plaintiff's license would not permit it to use software obtained from Mr. Mellish or any other private party.

### D.
### Ascertaining The Replacement Cost of the Oracle 8i Software

In the absence of fair market value, resort may be had to the cost of replacement. *See supra* at 29.  In order to determine the replacement cost of the two servers and software, plaintiff hired Pellegrino and Associates LLP, an intellectual property and software appraiser whose

business consists of valuing intangible assets, including computer software. (*Pellegrino* Dep. at 4-5). Michael Pellegrino, using the "Replacement Cost New Method," which he defined as determining "what it would take to give [the plaintiff] equivalent utility [of the lost items]," determined the replacement cost of the missing items to be $224,726.00. (*Pellegrino* Dep. at 10-11): $216,000.00 was for replacement of the lost Oracle 8i software with Oracle 11g software with a new license and $8,726.00 was for a new Dell Power Edge R510 server.[19]

The defendant does not question the various intermediate steps utilized by Mr. Pellegrino to arrive at his damage computation. Instead, it has taken the narrow, overly simplistic position discussed earlier, namely that DW Data has a license, Ms. Wright has a copy of the 8i software that she purchased from a business acquaintance for $90, and that to award $224,726 in damages, would be a windfall to the plaintiff. In the defendant's view, $216,000 is for a new license which the plaintiff does not need since it has a license. Thus it contends "the damages should be limited to the fair market value of the servers and software (not the value of the license)." (Defendant's Proposed Findings of Fact and Conclusions of Law at 4 (parenthesis in original) [Dkt. #59]. This conclusion is, as we have seen, mistaken.

## VI.
## DEPRECIATION AND OTHER ARGUMENTS
## NOT RAISED BY THE DEFENDANT

Often, depreciation is a factor to be taken into consideration in the determination of value. *Standard Oil Co. of New Jersey v. S. Pac. Co.*, 268 U.S. 146 (1925). However, the defendant has not raised that issue in any way. Nor has it contended that Mr. Pellegrino's

---

[19] The fair market value of the two servers that were lost was $12,145.00 based on what these servers were selling for on solarsystems.com. (*Wright Dep. at* 36-43). However, Mr. Pellegrino's valuation determined that one new server could closely mimic the computing power of the two older servers at a cost of $8,726.00. (*Pellegrino Report* at 30).

treatment of depreciation in his expert report is in any way mistaken. (*Plaintiff's Report* at 16). Hence, any objections that might have been raised are waived. The same is true of other questions and objections that might have had some bearing on the damage calculation or the liability question. The defendant has relied exclusively on the argument that the plaintiff's perpetual license will allow it to use 8i software, which the defendant claims is available on the market for $90 -- based upon Ms. Wright's transaction with a business acquaintance who had acquired the software for his personal use in an undisclosed way and from an unknown source.

Given the defendant's purposefully limited approach to this case, no other argument or objection can play a role in the determination of the case. It is not the task of the court to formulate legal arguments for the parties, especially when they are represented by counsel. *United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006); *Bretford Mfg., Inc. v. Smith System Mfg. Corp.*, 419 F.3d 576, 581 (7th Cir. 2005); *Burdett v. Miller*, 957 F.2d 1375, 1380 (7th Cir. 1992); *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 921-22 (7th Cir. 1997). "If we assume the lawyers' responsibilities, we unbalance the market for legal services and take time away from our consideration and decision of other cases." *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225, 230 (7th Cir. 1992)(Posner, J.).

## CONCLUSION

The plaintiff is awarded $224,726.00, which is comprised of $8,726 for a replacement server, plus $216,000 for the Oracle software and license to replace the no longer available 8i software, which has no ascertainable market value. Since the plaintiff's expert has not allotted a sum for installation, no amount will be awarded to the plaintiff. [20] The plaintiff's request for

---

[20] Mr. Pellegrino's opinion as to the replacement cost of an equivalent software license does not include the
(continued...)

punitive damages is denied, as is its request for the storage fees paid to Coakley.  All other

requests for damages are also denied.

ENTERED: _____

DATE: 6/25/13                UNITED STATES MAGISTRATE JUDGE

---

[20](...continued)
cost of installation or the cost of up to date service and support, because the plaintiff's existing license did
not have up to date service and support fees, and the cost of installation was found to be "indeterminate."
(*Pellegrino Report* at 30). A quote from Oracle for a new license with updated service and support was
$947,025.00. (*Wright Report* at 3).